IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JASON R. DODD,

                Plaintiff,

v.

DR. SYED and NURSE BEVERLY,

                Defendants.

OPINION AND ORDER

17-cv-569-wmc

---

*Pro se* plaintiff Jason R. Dodd is proceeding on Eighth Amendment claims against two staff members at the Columbia Correctional Institution ("CCI") in Portage, Wisconsin, allegedly arising out of deliberate indifference to needed treatment of his broken hand in 2015. In particular, plaintiff was granted leave to proceed (1) against Nurse Beverly for concluding that plaintiff did not need to see a physician shortly after he broke his hand, and instead simply wrapped his broken hand in an ace bandage; and (2) against Dr. Syed for later failing to arrange for timely corrective surgery after he learned via CT scan results that Dodd's hand injury had not healed. Defendants have moved for summary judgment on the ground that plaintiff failed to exhaust his administrative remedies. (Dkt. #32.) Dodd has also filed a proposed amended complaint, seeking to proceed against several, additional Doe defendants on claims related to how they handled his request for medical attention. (Dkt. #20.) For the following reasons, the court will deny both motions.

OPINION

I. Defendants' Exhaustion Motion (dkt. #32)

   A. Undisputed Facts

On February 3, 2016, Dodd submitted an inmate complaint ("CCI-2016-2556") regarding medical staff indifference to his pain. On March 16, the Inmate Complaint Examiner ("ICE") found no wrongdoing by the medical staff and recommended the denial of Dodd's complaint. According to the administrative process, ICE makes a recommendation to a Reviewing Authority ("RA"), who then decides to dismiss or affirm the inmate complaint. On March 24, the RA accepted ICE's recommendation and dismissed Dodd's complaint.

When Dodd actually became aware of this decision is unclear on this record, in part because Dodd was transferred to the Milwaukee County Jail on March 25, 2016, where he remained for 11 days. In particular, Dodd maintains that (1) he was unaware of the RA's decision before being transferred, and (2) the Milwaukee County Jail does not provide inmates with the opportunity or resources to appeal decisions from ICE. Regardless, it is undisputed that (1) Dodd returned to CCI on April 5, and (2) he was placed in disciplinary segregation from April 12 to May 12. Dodd also avers that he actually received notice of the RA's March 24 dismissal for the first time on April 12, at which point, he immediately submitted an appeal to the Corrections Complaint Examiner ("CCE") that same day. Finally, further muddling this record, Dodd's appeal was inexplicably postmarked by the Portage Post Office on April 25, 2016, and the CCE did not receive this appeal until May 2, 2016.

Regardless, the CCE dismissed Dodd's appeal notice as untimely upon receipt, noting that the RA issued her decision on March 24, and was printed out that same day, but his appeal was not received until May 2, 2016. Even taking into account a four-day grace period for the "prison mail box rule," therefore, the CCE found that Dodd's appeal was well beyond the 10-day timeframe for prisoners to submit an appeal under Wis. Admin. § DOC 310.13(1), and that there was no good cause to accept the late filing.[1]

Both parties presented affidavits to explain the time lapse between April 12 and May 2. Through an affidavit from CCI's ICE Michael J. Glass, defendants assert that a letter submitted by an inmate in general population or disciplinary segregation on Tuesday, April 12, 2016, would be driven to the Portage Post Office on the morning of Wednesday, April 13, 2016. (Glass Decl. (dkt. #44) ¶ 11.) Glass also avers that a letter postmarked by the Portage Post Office on Monday, April 25, 2016, would have been submitted no earlier than Saturday, April 23, 2016, at least assuming that the letter was postmarked on the same day it was received. (*Id*. ¶ 12.) Based on this, defendants conclude that "[t]he most likely explanation for the thirteen-day gap between the date on the appeal and the postmark is that Plaintiff dated the appeal April 12, 2016, but submitted it for mailing much later." (Defs.' Br. (dkt #43).)

Dodd presents a different account in his sworn declaration. Dodd avers that as soon

---

[1] Dodd's good cause argument for being late before the CCE had hinged upon his claimed misunderstanding of the distinction between ICE's recommendation date (March 16) and the RA's decision date (March 24). Dodd apparently believed that his appeal was due 10 days from the ICE recommendation date, meaning March 26, the day *after* his transfer to Milwaukee County Jail. Given the impossibility of his meeting this deadline, Dodd alleged that he believed the deadline would be viewed as a "delay tactic" by the institution when viewed jointly with his transfer to the Milwaukee County Jail on March 25. (Dkt #34-2.) The CCE did not find this to be good cause for the untimeliness of Dodd's appeal.

as he actually received the RA's decision, he appealed, even though he knew it was late. (Dodd Decl. (dkt #47) ¶ 10.)  To account for the delay in time, Dodd further alleges, without providing any examples, that correctional officers have been known to play games with inmate mail by delaying it or throwing it away and that "staff, even when they are not a defendant still have each other [sic] backs and will sometimes do things to intentionally sabotage an [inmate's] lawsuit or appeal process." (*Id*. ¶ 7.)

### B. Analysis at Summary Judgment

At the summary judgment stage, a court's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine, material issue for trial. *Anderson* 477 U.S. at 249.  Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Material facts" are those that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

If the moving party shows there is no genuine dispute as to any material fact, the opposing party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (quoting *Anderson* 477 U.S. at 252).  During summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party; however, this treatment does not extend to inferences supported by only speculation or conjecture. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman*

*v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019). Generally, "summary judgment cannot be used to resolve swearing contests between litigants." *Quirino v. Peterson*, No. 16-CV-1007, 2017 WL 6805635, at *2 (E.D. Wis. Nov. 9, 2017) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)). However, if opposing parties tell two different stories, a court may issue summary judgment when one side is blatantly contradicted by the record, pushing its story beyond belief for a reasonable jury. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

Under 42 U.S.C. § 1997e(a), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." To comply, a prisoner must "properly take each step within the administrative process." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). This includes following instructions for filing appeals, *Burrell v. Powers*, 431 F.3d 282, 284-85 (7th Cir. 2005), and doing so "in the place and at the time [as] the prison's administrative rules require." *Pozo*, 286 F.3d at 1025. If a prisoner fails to file a timely appeal, then he has failed to exhaust his administrative remedies, and his suit must be dismissed. *Id*.

To exhaust administrative remedies in Wisconsin between 2014 and 2018, a prisoner would need to file an inmate complaint with the ICE to challenge significant issues regarding rules, living conditions, or staff actions affecting institution environment within 14 calendar days of the occurrence giving rise to the complaint. Wis. Admin. Code §§

5

DOC 310.01, 310.09(6).[2] ICE was then required to either reject the complaint or send a recommendation to the appropriate RA within 20 working days from the date of acknowledgement. Wis. Admin. Code § DOC 310.11(11). Generally, inmates in Wisconsin had 10 days to appeal a denial from the ICE. In addition to the standard 10 days, the CCE can consider a four-day grace period for the so-called "prison mail box rule," as was done here.

The RA was then required to make a decision within 10 working days following the ICE's recommendation. Wis. Admin. Code § DOC 310.12(1). The RA decision was limited to dismissal, affirmation, or returning the complaint to the ICE for further investigation. Wis. Admin. Code § DOC 310.12(2). Following that decision, a dissatisfied complainant could still appeal to the CCE within 10 calendar days after receipt of the RA's decision. Wis. Admin. Code § DOC 310.13(1). However, the CCE, upon good cause, had discretion to accept appeals outside of this 10-day window. Wis. Admin. Code § DOC 310.13(2). If a prisoner filed an appeal, the CCE was also required to provide notice of receipt of this appeal within 5 working days. Wis. Admin. Code § DOC 310.13(4).[3]

---

[2] In 2018, a new version of Wis. Admin Code ch. DOC 310 went into effect. Because the relevant events in this case occurred before 2018, the references to the Wis. Admin. Code ch. DOC 310 will be to the December 2014 version, which is available at https://docs.legis.wisconsin.gov/code/register/2018/747B/remove/doc310.pdf.

[3] After this case's briefs were already submitted, the Seventh Circuit held that exhaustion is not achieved when a prisoner files a timely appeal, but rather only when the prisoner receives a receipt of his timely appeal. *Lockett v. Bonson*, 937 F.3d 1016, 1022 (7th Cir. 2019) ("Absent a receipt, . . . an inmate's administrative remedies are not considered exhausted'"). In *Lockett*, a Wisconsin prisoner claimed to have filed a timely appeal, yet never received a receipt from the CCE. *Id*. Because the CCE was required by Wisconsin regulation to provide a receipt within 5 working days of receiving an appeal, the court held that the prisoner was "obliged to regard the absence of a receipt as a red flag, [meaning] he should have undertaken, through the complaint procedure, an inquiry to ascertain why he had not received this important document." *Id* at 1027. Because the prisoner failed to make that inquiry, the court held that he had not exhausted his administrative

Here, neither party claims that the administrative process was followed in accordance with the letter of the law. Defendants argue that this entitles them to summary judgment, while plaintiff argues that since he followed the administrative process to the best of his abilities, he has shown good cause for missing his 10-day appeals window, and further that delays in his filings can be explained by "correctional officers intentionally play[ing] games with our mail!!" However dubious the second of plaintiff's argument may be, the court will deny defendants' motion for summary judgment for the following reasons.

Dodd principally contends that he followed the administrative process to the best of his ability, but there were delays in his receiving the RA's decision in the mail and then staff delayed the mailing of his appeal. In construing the record of Dodd's efforts in a light most favorable to him, the court accepts that he filed his appeal at the first available moment, which happened to be April 12 -- nine days late. Notwithstanding *Pozo* and *Porter*, "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016) (quoting *Booth v. Churner*, 532 U.S. 731 (2001)). Unlike the prisoner in *Porter*, who took no administrative step to appeal, or the prisoner in *Pozo*, who waited a year before filing an appeal for denial of a complaint, Dodd's averments reasonably support a finding that he at least attempted to submit his appeal as soon as he received the RA's decision. While defendants suggest that Dodd must not have put his appeal out for mailing on April 12 as he now avers, they have submitted no evidence to

---

remedies. *Id*. This issue is not properly before this court on summary judgment, however, since neither plaintiff nor defendant has raised the issue, nor presented evidence as to its relevance.

rebut his averment. Accordingly, the court concludes that defendants have not proven at summary judgment that Dodd failed to exhaust his administrative remedies with respect to his claims. Accordingly, defendants' motion for summary judgment on exhaustion grounds will be denied.[4]

**II. Motion to Amend Complaint (dkt. #20)**

Under Federal Rule of Civil Procedure 15(a)(2), the court "should freely give leave when justice so requires." *Id.* "Leave to amend pleadings is left to the sound discretion of the district court." *Bethany Pharmacal Co. v. QVC, Inc.*, 241 F.3d 854, 860-61 (7th Cir. 2001). The court may deny leave to amend where there has been "undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile." *Gonzalez-Koeneke v. West*, 791 F.3d 801, 807 (7th Cir. 2015). Since Dodd's allegations in his proposed amended complaint are not sufficient to state a viable, deliberate indifference claim against any of the proposed additional defendants, the court will deny Dodd's request to amend his complaint as well.

Dodd seeks to proceed against nine additional defendants, all of whom were nurses at CCI during the time period Dodd was seeking care for his hand. Those proposed additional defendants are: Jane Does 1-4, T. Anderson, K. Newbury, A. Grafton, M. Thorne, and D. Valerius. Dodd seeks to proceed against them based on their alleged handling of his various Health Service Requests ("HSRs") submitted between November

---

[4] Although defendants have submitted insufficient evidence of plaintiff's failure to exhaust to prevail on this record, they are not precluded from coming forward with additional evidence by the summary judgment deadline of March 13, 2020, including raising the argument considered by the Seventh Circuit in *Lockett*.

of 2015 and July of 2016. For context in deciding plaintiff's motion, therefore, the court will begin with a summary of those HSRs and how the proposed defendants allegedly responded.[5]

On November 11, 2015, Dodd submitted an HSR complaining that his hand was broken and needed medical help because he was in pain. Jane Doe 1 responded the next day that (1) the doctor would review the x-ray reports, and (2) Dodd was scheduled to see the doctor. On November 15, Dodd submitted another HSR advising that his family would be contacting the Director of the DOC's Bureau of Health Services because the doctor was refusing to see him. On November 17, however, Doe 1 responded in writing that Dodd had been seen on November 17.

That same day, November 17, Dodd wrote in yet another HSR that his visit with the doctor had been "useless," and he complained that it took a week after his x-ray to see the doctor. He also claimed that all he was given for his broken hand was an ACE bandage and partial cast. On November 19, Doe 1 responded that Dodd should wear the splint as instructed by the doctor and also informed him that he had an x-ray scheduled as a follow-up to his previous x-ray. On November 21, Dodd also requested a lower bunk and floor restriction, and on November 24, Doe 1 responded that this restriction had been entered and would last through January 17, 2016.

On November 26, 2015, Dodd wrote to HSU that his partial cast and bandage was dirty and sweaty. On November 28, Nurse Valerius responded that an appointment had been made with a nurse. On December 15, Dodd next complained that his cast and wrap

---

[5] The court construes Dodd's proposed allegations generously, resolving ambiguities and drawing reasonable inferences in plaintiff's favor. *Haines v. Kerner*, 404 U.S. 519, 521 (1972).

had not been changed when he went for his x-ray and was no longer properly secured. On December 17, Doe 1 responded that she had not realized that his cast was not properly taken care of, and that Dodd was seen in the HSU on December 18, at which time his bandage and partial cast were taken off, apparently at the orders of Dr. Syed.

On December 21, 2015, Dodd wrote that a nurse saw him on December 18 and took his bandage, but he was still in pain and his hand still felt "broke." Doe 1 responded on December 23 that his most recent x-ray revealed that his hand and finger had healed and that his doctor discontinued his cast.

On December 26, 2015, Dodd wrote that he needed to go to UW-Madison for treatment for his hand, both because it continued to feel broken and he believed it had not healed properly. Dodd also wrote that he was in extreme pain, to which Jane Doe 2 responded that Dodd was scheduled to be seen. On December 27, Dodd wrote that it now hurt "like hell," complaining that no one mentioned the possibility of physical therapy, and Doe 2 responded on December 28 that he was scheduled to be seen.

On January 2, 2016, Dodd wrote that while HSU saw him before the holiday, nothing was done; he did not have pain medication; and he did not have a cast. Nurse T. Anderson responded on January 4, directing Dodd to discuss his request for medication and additional imaging at his upcoming doctor's appointment, adding that all of his x-rays were negative. Also on January 2, Dodd wrote that he knows he needs surgery; he must have a torn ligament; he could not hold his meal tray; and he had difficulty showering. Nurse Anderson responded on January 4, referring Dodd to her response to his January 2 HSR. At some point after this HSR, Dodd met with a physician and underwent a CT scan.

On January 25, 2016, Dodd wrote asking when he would see the results of the CT

scan, asking for a new cast, and complaining about knee pain. Doe 1 responded on January 29, explaining that no protective cast had been ordered by the doctor; there were no CT scan results in his chart; and his x-ray was normal. However, she did forward his request to a physician for consideration. On January 28, Dodd complained that something in his hand must be torn, reporting that he still could not hold a tray, but now also could not wash, and that the pills he was taking were not working. Dodd also asked that his apparent authorization for an ice bag be extended. Doe 1 responded on February 1 that he was scheduled to be seen by a doctor, but denied his request for an ice bag extension.

On February 1, 2016, Dodd wrote to complain that he still had not received his CT scan results. Nurse A. Grafton responded the next day that he was scheduled to be seen. More than a month later, on March 9, however, Dodd again complained that he was being neglected, and accused the HSU of pretending not to have received his CT scan results. Nurse Jane Doe 3 responded again on March 11 that Dodd should discuss that issue at his upcoming appointment.

On March 20, 2016, Dodd wrote that he was still in pain, and the aspirin and other medications he was receiving did not work. Nurse K. Newbury responded on March 23 that Dodd was to be scheduled to see an orthopedic hand surgeon, and that she forwarded his chart to the physician to address his request for different pain medications. On March 21, Dodd also requested casts for both his hand and knee for an upcoming trip to court, to which Nurse Newbury responded that PT had been ordered, but had not yet been scheduled. Dodd next complained about hand pain on April 6, once again asserting that aspirin was insufficient, to which Doe 1 responded on April 8 that he should discuss that issue when seen by the orthopedic surgeon.

11

By April 10, 2016, Dodd wrote to advise HSU that he was filing a notice of claim (apparently against Nurse Mashak) about his medical care because staff had been neglecting him and lying to him about when they received the results of his CT scan. He received a response that Mashak was no longer working at CCI. On April 18, Dodd once more complained about hand and knee pain, and the next day Nurse Newbury noted that he had been seen on April 18. On May 21, Dodd also complained that while he had been fitted for a knee brace, that brace had been cancelled. He further wrote that his hand was cramping up, and that UW-Madison would be calling. On May 24, Nurse Thorne responded that he was scheduled for physical therapy. At some point after this date (it is unclear when), Dodd underwent corrective surgery at UW-Madison that left him in a cast for a short period of time.

On July 4, 2016, Dodd asked to extend his ice bag restriction again and complained that he was not receiving the medication prescribed by a physician at UW-Madison. On August 5, Nurse Thorne advised Dodd in writing that off-site prescription orders were treated as recommendations only, and that the on-site physician may re-write a prescription if he felt it appropriate. On July 10, Dodd again complained that his medications were not working, and Nurse Anderson responded on July 12 that he was scheduled to see his physician to discuss his pain and current medications. On July 28, Dodd specifically asked for ten Tylenol 3s, and Nurse Valerius responded on July 31 that the orders from his July 27 visit to UW-Madison's orthopedic department had to be reviewed by the on-site physician before he could receive them. On August 6, Dodd wrote that he was in extreme pain and once again asked for the medication prescribed by the UW-Madison physician. The next day, August 7, Dodd once more complained about the

Tylenol 3 prescription, and Thorpe responded on August 9 that there were no orders for Tylenol 3, and again reminded Dodd that off-site prescription recommendations do not constitute active orders until approved by an on-site physician or other authorized person.

On September 14, 2016, Dodd wrote that his cast had been removed, and he wanted to know if he was scheduled for physical therapy. He also asked for an extension of his ice bag restriction. On September 16, Jane Doe 4 responded that there was not an appointment scheduled for him, and if he wanted more ice bags, he would need to be reevaluated by HSU.

On September 19, 2016, Dodd once more wrote to complain that while the UW-Madison physician prescribed him Tylenol 3 and recommended he stay away from ibuprofen, he had not received Tylenol 3. Dodd also asked about physical therapy. HSU Manager Ghode responded on September 21 that the Tylenol 3 order from June of 2016 was intended to be for five days only, and it would not be renewed. Remarkably undeterred, Dodd asked again on October 3 about physical therapy and his pain medications. Thorne responded by scheduling him to be seen. On November 14, Dodd once more complained about pain and inadequate pain medication, adding that the exercises the doctor gave him caused him pain and that he needed medical attention. Anderson responded that he was scheduled to be seen during sick call.

As previously noted, Dodd now seeks leave to proceed on Eighth Amendment deliberate indifference claims against all of the nurses mentioned above. A prison official violates the Eighth Amendment in the context of a prisoner's medical treatment if shown to have acted with "deliberate indifference" to a "serious medical need." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *see also Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997).

"Deliberate indifference" encompasses two elements: (1) awareness on the part of officials that the prisoner needs medical treatment, and (2) disregard of this risk by conscious failure to take reasonable measures. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994.) "Serious medical needs" include: (1) life-threatening conditions or those carrying a risk of permanent serious impairment if left untreated; (2) withholding of medical care that results in needless pain and suffering; or (3) conditions that have been "diagnosed by a physician as mandating treatment." *Gutierrez v. Peters*, 111 F.3d 1364, 1371 (7th Cir. 1997).

Thus, a plaintiff must prove three elements to prevail:

1. Plaintiff had an objectively serious medical need.

2. Defendants knew that plaintiff needed treatment.

3. Despite their awareness of the need, defendants consciously failed to take reasonable measures to provide the necessary treatment.

Even accepting that Dodd's condition presented a serious medical need, the court cannot grant plaintiff leave to proceed against the proposed additional defendants.

In particular, the problem with Dodd's allegations against each of these nurses is that they do not permit a reasonable inference that any of them outright ignored or were deliberately indifferent to Dodd's HSRs. On the contrary, the proposed defendants are alleged to have consistently responded in writing within a day or two of his requests with responses that on their face appear reasonable, including (1) that Dodd was scheduled to be seen in the HSU or by his physician; (2) the information or materials Dodd wanted was provided; and/or (3) medical treatment decisions or judgment must be deferred to Dodd's physician, especially when Dodd's request was related to the interpretation of his x-rays or the materials that should be used to treat his broken hand. Additionally, while Dodd

provides little, if any, details about what medications or pain relief items he actually received from HSU, he was at least receiving access to ice bags and medications throughout this time frame, albeit insufficiently. As such, a reasonable jury would have no basis to infer that any of the nurses were ignoring his complaints about pain; instead, they are alleged to have either provided him with his prescribed pain medication or referred his request for more efficacious medications to his treating physician.

Dodd also *appears* to take issue with the fact that the nurses deferred to his treating physician when it came to his access to a cast and pain medications, as well as the interpretation of his x-rays and CT scan. However, only in circumstances in which it would be *obvious* to a nurse is there an obligation for a nurse to question the physician's orders. *See Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) (nurses are generally required to defer to treating physician's instructions and orders); *Holloway v. Delaware Cty. Sheriff's Office*, 700 F.3d 1063, 1075 (7th Cir. 2012) ("[N]urses may generally defer to instructions given by physicians" unless "it is apparent that the physician's order will likely harm the patient.").

Here, Dodd has certainly not alleged that these nurses ignored his complaints that he needed a cast. Instead, he alleges that they did not give him access to items that his physician had deemed unnecessary. For example, given that Dodd's x-rays showed that his bone was healed, a reasonable jury could *not* find it obvious that Dodd still required a cast. Similarly, the nurses did *not* ignore his pain complaints: as alleged, Dodd was receiving pain medication and, at least for some period of time, he had access to an ice bag, *and* the nurses referred his requests for other pain medication *to the physicians* that Dodd was seeing. This is not to say that the decisions made by these doctors regarding Dodd's

15

access to a cast, proper medication, and adequate imaging to identify the source of his pain will necessarily pass constitutional muster. Indeed, that is why Dodd has been allowed to proceed on claims against defendants Beverly and Syed regarding the delays he experienced between 2015 and 2016 after undergoing corrective surgery. While Dodd has alleged that he sought different treatment from various HSU staff during the relevant time period, he was also consistently receiving treatment. Accordingly, the court will deny Dodd's motion to amend, and he may not proceed against the additional defendants in his proposed amended complaint.

## ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment on its affirmative defense of exhaustion (dkt. #32) is DENIED without prejudice provided that it is renewed by the March 13, 2020, summary judgment deadline.

2) Plaintiff Jason Dodd's motion to amend his complaint (dkt. #20) is also DENIED.

Entered this 10th day of February, 2020.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge