IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JASON R. DODD,

                           Plaintiff,                              OPINION AND ORDER

     v.

                                                               17-cv-569-wmc

DR. SYED and
BEVERLY VEYNA,

                           Defendants.

---

*Pro se* plaintiff Jason Dodd injured his hand in mid-November of 2015 while incarcerated at Columbia Correctional Institution ("Columbia"). The injury required surgery, which Dodd eventually underwent on June 29, 2016. Under 42 U.S.C. § 1983, Dodd sued various Columbia employees who were involved in responding to his repeated requests for medical attention, and the court granted him leave to proceed against two of those employees -- Nurse Beverly Veyna and Dr. Salam Syed -- on claims of Eighth Amendment deliberate indifference. Currently before the court are (1) Dodd's motion for miscellaneous relief (dkt. #84), and (2) defendants' motion for summary judgment (dkt. #56). For the reasons that follow, the court will deny Dodd's motion, grant defendants' motion for summary judgment as to Veyna, deny that same motion as to Dr. Syed, and set this matter for an evidentiary hearing with respect to Syed's exhaustion defense.[1]

---

[1] More recently, defendants renewed a request for a modification of the trial schedule (dkt. #93), which acknowledges that there is no longer a calendar conflict, but seeks relief from the August 21st pretrial disclosure deadline. In light of the timing of this decision and defendants' counsel's represented software maintenance on the evening of August 20th, both sides will be given an additional week to file their pretrial submissions.

UNDISPUTED FACTS[2]

**A. The Parties**

Plaintiff Dodd was incarcerated at Columbia in November of 2015, where defendants were working at the time.  Defendant Syed was employed as a physician and responsible for providing medical services to prisoners.  Defendant Veyna was employed as a Nurse Clinician and provided nursing care to prisoners.  Her duties included assessing and treating patients, assisting physicians in providing medical services, managing medication, providing emergency care, and maintaining medical records.

**B. Dodd's Injury to Fifth Metacarpal and Dislocation at Carpal-Metacarpal of Right Hand**

In early November of 2015, Dodd injured his right hand when he punched a wall while shadow boxing.  On November 7, Dodd was seen in the Health Services Unit ("HSU") by a nurse who provided him with a splint for his right hand, an ice bag, and an extra pillow for elevation until November 30.[3]

On November 10, 2015, Dodd also underwent an x-ray of his right hand.  The next day, Dr. Syed reviewed the Radiology Report on the x-ray, which stated that there was "a slightly displaced fracture at the base of the right fifth metacarpal, subluxation at the

---

[2] The court draws the following material facts from the parties proposed findings of facts and responses, along with the cited evidence of record, viewing the evidence in a light most favorable to plaintiff as the non-moving party.

[3] Although not material to the pending motions, there is some dispute whether Dodd was immediately seen in HSU the same day as the injury, or whether his injury had occurred two days before on November 5.

carpal-metacarpal joint is not excluded.  There is an old healed right fourth metacarpal fracture with negligible angular deformity.  There is regional soft tissue swelling." (Held Decl. Ex. 1000 (dkt. #61-1) 0006.)

On November 12, 2015, HSU received a Health Services Request ("HSR") from Dodd dated November 11, which states that his hand was broken, he was in pain, and he wanted medical attention.  HSU staff responded that the doctor would review the x-ray report and Dodd had an appointment scheduled with the doctor.

### 1.  Initial Treatment

On November 13, 2015, six to eight days after Dodd's injury, an order was placed for Naproxen 220 mg, and he was instructed to take one tablet as needed for a month. Dodd claims that Nurse Practitioner Veyna was responsible for providing him Naproxen that day.  He also claims that Veyna told him that his hand was broken and instructed him to keep his ace wrap secured on his hand.  According to Dodd, Veyna further expressed surprise that she was the first to tell him that he had a fracture.[4]

On November 17, 2015, HSU received an HSR from Dodd dated November 15, which reported that Dodd's family would be contacting Director of Health Services James Greer about Dodd's treatment.  HSU staff apparently responded that Dodd was scheduled

---

[4] Defendants dispute that Veyna had any interaction with Dodd that day.  Moreover, Veyna attests that she would not have been the one to inform Dodd about his x-ray results -- or even known about the x-ray results, given her limited interactions with him.  Initially, defendants' position was that Veyna was not even working that day.  However, Dodd submits what appears to be a copy of Columbia's HSU schedule, which indicates that Veyna *was* working that day.  (*See* Dodd Decl. Ex. A1 (dkt. #73-1).)  Defendants appear to have since abandoned their position as to Veyna's presence at Columbia on November 13, 2015.  Regardless, the record comes down to one of credibility at this point.

to see the doctor that same day, which he was.  At that time, Dr. Syed also increased Dodd's Naproxen dosage to 440 mg as needed for one month, and he ordered him Tylenol 1000 mg and ice as needed for a month.  Dr. Syed also "continued" Dodd's low bunk restriction[5] and ordered a follow-up x-ray on Dodd's right hand for three weeks.

Almost a month later, on December 15, 2015, Dodd underwent a follow-up x-ray for his broken hand.  At that time, a radiologist, Dr. Rivera-Morales, made the following findings:

> Normal carpometacarpal articulation of the thumb.  Normal second through fifth carpometacarpal articulations.  There is healed fracture of the fourth metacarpal bone.  Normal metacarpophalangeal articulations.  Normal phalanges.  Normal interphalangeal articulations.  There is no definite plain film finding of demineralization.  There is no demonstrated soft tissue abnormality.

(Ex. 1000 (dkt. #61-1) 007.)  The conclusion was "Healed fracture of the fourth metacarpal bone."  (*Id.*)  On December 18, 2015, Dr. Syed discontinued Dodd's use of a hand splint, citing the radiology report.

### 2.  Dodd Asks to See a Specialist

On December 23, 2015, however, HSU received an HSR from Dodd dated December 21, stating that a nurse had taken his bandage and splint from him on December 18, which he believed was a mistake because his hand felt like it had two weeks after the accident.   Dodd then asked to go to "Madison" -- presumably the DOC's medical contractor, the University of Wisconsin-Madison hospital -- because he remained in pain and his hand still felt broken.  HSU staff responded that a doctor had reviewed his x-ray,

---

[5] It is unclear when Dodd received the low bunk restriction in the first instance.

which revealed that his hand and fingers were healed, and discontinued Dodd's use of a splint.

On December 28, 2015, HSU received two HSRs from Dodd.  In one, dated December 26, Dodd wrote that he knew it was not cheap to send him to Madison, but he believed his hand was broken and surgery was needed.  Dodd also complained that HSU staff were not helping him.  HSU also received a second from Dodd on December 28, which was dated December 27.  In it, Dodd wrote:  that the nurse had not mentioned physical therapy; the doctor never saw him after the second x-ray; he could not pick up a tray; and he wanted a second opinion.  Responding to both HSRs, HSU advised that Dodd was scheduled for an appointment with a nurse.

On December 29, 2015, Dodd was seen in the HSU for an evaluation of his ongoing right-hand pain.  During this visit, Dodd reportedly cursed at staff about "taking things" from him.  Staff reported that his x-rays revealed normal findings and that the splint was no longer warranted.  To splint his wrist, Dodd stated he was using an ace wrap from a knee injury, along with a piece of cardboard.  HSU did not re-issue him an actual splint. Instead, Dodd was given a four-inch ace wrap in exchange for his old six-inch ace wrap.

On January 4, 2016, HSU received two more HSRs from Dodd, both dated January 2.  In them, Dodd wrote that:  (1) he had been seen in the HSU before the holiday but nothing had been done; (2) he was told to see a doctor after the new year; (3) he had no pain medication and could not hold a tray; (4) it was difficult to take a shower or write because of his pain; and (5) he still believed that he needed surgery.  HSU staff responded by instructing Dodd to discuss his request for pain medication and imaging at his upcoming

doctor appointment.  That same day, Dr. Syed examined Dodd for his complaints of right-hand pain.  Dodd requested an MRI for his right hand.

### 3.  Dodd Referred to Orthopedist

To address his concerns about his hand, Dr. Syed referred Dodd to physical therapy, as well as to Dr. O'Brien, who was the orthopedic doctor that Dodd had been seeing for his right knee issue.[6]  On January 14, 2016, Dr. O'Brien examined Dodd's hand.  O'Brien recommended a CT scan of the 5th metacarpal joint on Dodd's right hand, combined with a physical examination.  Dr. O'Brien also issued Dodd a cock-up splint, which is a large splint designed to immobilize the hand in the position of function during healing. Although Dodd claims that he did not actually receive the cock-up splint, Dr. Syed maintains that he approved Dr. O'Brien's orders on January 15, 2016.

In contrast, Dodd claims that he submitted an HSR on January 25, 2016, writing that the "cardboard" he was using as a splint was breaking.  Dodd further claims that HSU staff responded on January 29, that no splint or protective cast had been ordered and the x-ray was normal.  (*See* Dodd Decl. (dkt. #72) ¶ 10; Ex. A (dkt. #71-1).)[7]  However, Dodd provides no details about who from the HSU was responsible for this response or how it was conveyed, nor does he suggest that either defendant was involved.

---

[6] Dodd also brought up continuing issues related to his right knee, but that condition is not a part of this lawsuit.

[7] Defendants object to Dodd's evidence in support of this proposed factual finding, arguing that Dodd did not turn over his copy of this HSR in discovery, and because the HSR Dodd submitted as evidence is illegible.  (*See* Ex. A (dkt. #71-1) 1.)  Defendants are correct that the HSR is illegible, but given that Dodd also attested to the details of the HSR, the court will accept Dodd's statements as evidence supporting this proposed finding of fact for purposes of summary judgment.

### 4. First CT Scan Confirming Fracture at Base of Fifth Metacarpal of Right Hand

On January 26, 2016, Dodd underwent a CT of his right hand, which revealed, "Chronic displaced impaction fracture involving almost the entire base of the 5th metacarpal; impaction fracture of the hamate." (Ex. 1000 (dkt. #61-1) 015-017.) On January 29, Dr. Syed followed up with Dr. O'Brien regarding the completed CT scan, although the record does *not* indicate that Dr. Syed communicated the results of the scan to Dodd, modified Dodd's pain medications, or provided Dodd with any means to mobilize his hand. Also, Dr. Syed does not elaborate on the substance of his discussion with Dr. O'Brien.

On February 2, 2016, HSU received two, additional HSRs from Dodd, both dated February 1, which sought CT results for his hand and information as to when he was scheduled to see the doctor. Although HSU staff responded by indicating that he was scheduled to be seen by a doctor, it is unclear whether that occurred in February. Regardless, on February 26, Dodd submitted another HSR dated February 24, requesting a medication review of his Naproxen, as well as a start to physical therapy. Dodd also reported that the doctor had ordered Naproxen 500 mg to be taken twice daily. HSU staff responded that the Naproxen had been issued on February 12, and it was too soon for a refill. Finally, Dodd was told that a refill would be available after March 10.

### 5. Initial Order for Hand Surgery, Splint and Narcotic Pain Relief

On March 11, 2016, HSU received a follow-up HSR from Dodd dated March 9, 2016, again requesting his CT results, which staff directed Dodd to discuss at his upcoming

appointment.  The parties also have not provided details about when that appointment took place.  However, Dr. Syed apparently met with Dodd within a week, since on March 18, he submitted a "Prescriber's Order":  (1) to schedule surgery with the orthopedic hand surgeon; (2) provide Dodd a right wrist cock-up splint for PT to issue; and (3) to consider a light dose of narcotic pain medication.  (Ex. 1000 (dkt. #61-1) 025, 027.)  However, Dr. Syed does not attest that he took any further action with respect to Dodd's medications or surgery order at that time.  In fact, no one reached out to UW-Madison to schedule surgery until May 6, 2016.

In the meantime, Dodd continued to try to obtain a splint and pain relief. Specifically, on March 23, 2016, HSU again received two HSRs from Dodd.  In one, dated March 20, Dodd wrote that his hand had been in severe pain since November 2015, and his medication was not working.  HSU staff responded to Dodd that he was being scheduled to see an orthopedic hand surgeon, and his chart was sent to the doctor with a request for pain medication.  The second HSR received March 23 was dated March 21.  In that HSR, Dodd requested a cast for his hand, to which HSU staff responded, "PT ordered [but] have not received yet."  (Ex. 1000 (dkt. #61-1) 060.)

Dodd further claims that he submitted another HSR on April 18, 2016, complaining about his hand pain and asking for a cast.  (Dodd Decl. (dkt. #71) ¶ 23.)  While Dodd was apparently seen on April 18, the parties have provided no details about exactly who Dodd met with that day or what was said.  On April 19, an order was placed for Naproxen 200 mg, two tablets twice daily as needed, although again it is unclear who ordered this prescription.  On April 20, Nurse Practitioner Veyna performed rounds in the Restrictive

Housing Unit ("RHU"), where Dodd was housed, during which she gave him a regular ice bag after confirming that an order to do so was in place.

### 6.  Second Referral for Hand Surgery and Splint

On May 6, 2016, apparently learning that Dodd still did not have the splint, Dr. Syed approved a second order for the cock-up splint and to schedule Dodd for surgery. (*See* Ex. 1000 (dkt. #61-1) 30-32.)[8]  That same day, Veyna followed Dr. Syed's instruction, completing the "Off-Site Service Request and Report" and referring Dodd to UW Orthopedic to schedule surgery.  Veyna attests that (1) she would have faxed this request directly to UW Orthopedics, and (2) off-site appointments are scheduled according to the availability of the off-site hospital or specialist.  Neither Dr. Syed nor Veyna explain why Dr. Syed's March 18 order took so long to be carried out, nor why Dr. Syed had to place the second order.

Ultimately, on June 6, 2016, Dr. Syed renewed his March 18 order for the splint, noting that the splint "never arrived or got ordered."  (Ex. 1000 (dkt. #61-1) 27.)  On June 27, Dodd was next seen at UW Health-Orthopedics for a pre-surgery appointment.  While Dr. Jonathan L. Tueting wrote Dodd a prescription for ten tablets of Tylenol No. 3 at that time, Dr. Syed believed the prescription was unnecessary, since Dodd was already receiving Tylenol 3 during the month of June and would continue to receive it up until the date of his surgery.

---

[8] These documents indicate that Dodd was seen by someone in HSU on May 4, 2016.  It is unclear from the record who Dodd met with that day, but it does not appear to have been Veyna or Dr. Syed.

### C. Hand Surgery

On June 29, 2016, Dodd underwent fusion surgery on his right 4th and 5th metacarpals at the University of Wisconsin Hospital.  After performing the surgery, Dr. Tueting recommended that Dodd again receive Tylenol 3 and visit a clinic for a follow-up appointment in two weeks.  Dodd was discharged the same day, but claims he never received Tylenol 3 for his post-surgery pain.  Defendants dispute this, pointing to a note on Dodd's prescriber's orders indicating that Dr. Syed approved him for Tylenol 3 post-surgery.  (*See* Ex. 1000 (dkt. #61-1) 33.)

Dodd further claims that he submitted multiple HSR's between July and September complaining that he was still not receiving the Tylenol 3 that Dr. Tueting recommended, and HSU staff responded that his physician would need to write the prescription if he deemed it appropriate.  (Dodd Decl. (dkt. #72) ¶¶ 52-57.)[9]  Dodd also claims that Dr. Syed never met with him post-surgery, nor did he adjust Dodd's pain medications.  On November 1, 2016, a scan showed that his fractures had healed, but Dodd insists that he continued to be in pain and was submitting HSR's requesting medical attention throughout November.

### D. Dodd's Inmate Complaint about his Treatment

On February 3, 2016, Dodd submitted an inmate complaint ("CCI-2016-2556") regarding medical staff indifference to his pain.  On March 16, the Inmate Complaint

---

[9]  Again, defendants object to Dodd's reference to HSRs that he did not produce to defendants during discovery.  However, defendants did not seek to compel its production, and the absence of documentary evidence of the HSR does not preclude Dodd from averring that he submitted it.

Examiner ("ICE") recommended the denial of Dodd's complaint.  On March 24, the Reviewing Authority ("RA") accepted ICE's recommendation and dismissed Dodd's complaint.

Dodd was transferred to the Milwaukee County Jail on March 25, 2016, where he remained for 11 days.  Dodd maintains that:  (1) he was unaware of the RA's decision before being transferred; and (2) the Milwaukee County Jail does not provide inmates with the opportunity or resources to appeal decisions from ICE.  While Dodd returned to Columbia on April 5, he was placed in disciplinary segregation from April 12 to May 12. As a result, Dodd attests that he received notice of the March 24 dismissal for the first time on April 12 and submitted an appeal to the Corrections Complaint Examiner ("CCE") that same day.

> In his appeal, Dodd argued:
>
> This complaint may be late because it was printed on 3-24-2016.  And the recom[m]endation date was on 3-16-2016.  9 days later.  Knowing I only have 10 days from the recommendation date to file the appeal.  This was a delay tactic by the Inst[itution].  And I was also not in the Inst[itution] from 3-25-16 - 4-5-2016.  So within that time frame is when they sent me the denial I.C.E.  I also had to wait to get this form.
>
> I was in Milw[aukee] County from 3-24 [to] 4-5-16.  Milwaukee Case No 13CF3026.  Check to verify.

(Dkt. #34-2, at 33.)  Accordingly, Dodd's good cause argument for being late before the CCE hinged upon (1) his misunderstanding about the distinction between ICE's March 16 recommendation and the RA's March 24 decision, and (2) the fact that the denial was sent when he was not at CCI.

Still, Dodd's appeal was postmarked April 25, 2016, and the CCE did not receive his appeal until May 2, 2016.  To account for this delay, Dodd attests that segregated inmates experience delays in obtaining their property, sending mail, and obtaining items from canteen (such as stamps).  (Dodd Decl. (dkt. #47) ¶ 5.)  Dodd also attests that: correctional officers have been known to play games with inmate mail by delaying it or throwing it away; and "staff, even when they are not a defendant still have each other[s] backs and will sometimes do things to intentionally sabotage an [inmate's] lawsuit or appeal process."  (*Id* ¶ 7.)

Defendants counter that it is likely Dodd submitted his appeal for mailing later than April 12, but they have no direct evidence that he lied.  Instead, they submit an affidavit from Michael J. Glass, CCI's ICE, who attests that inmates in disciplinary segregation must slide their mail under their cell doors, which is picked up by correctional staff on a daily basis and placed into a box in the unit designated for that purpose.  (Glass Decl. (dkt. #44) ¶ 8.)  Glass further attests that:  (1) a letter submitted by an inmate in general population or disciplinary segregation on Tuesday, April 12, 2016, would normally have been driven to the Portage Post Office on the morning of Wednesday, April 13, 2016 (*id.* ¶ 11); and (2) a letter postmarked on Monday, April 25, 2016, would have been submitted no earlier than Saturday, April 23, 2016, at least assuming that the letter was postmarked on the same day it was received (*Id.* ¶ 12).  Based on this, defendants conclude that "[t]he most likely explanation for the thirteen-day gap between the date on the appeal and the postmark is that Plaintiff dated the appeal April 12, 2016, but submitted it for mailing much later."  (Defs.' Br. (dkt #43).)

The CCE dismissed Dodd's appeal as untimely, noting that the RA issued her decision on March 24, that the decision was printed out that same day, yet his appeal was not received until May 2, 2016.  Even taking into account a four-day grace period for the "prison mail box rule," therefore, the CCE reasoned that Dodd's appeal was well beyond the 10-day timeframe for prisoners to submit an appeal under Wis. Admin. § DOC 310.13(1), and there was no good cause to accept his late filing.

OPINION

The court will first address Dodd's discovery-related concerns, and then will turn to defendants' motion for summary judgment.

I.      **Motion for Miscellaneous Relief (dkt. #84)**

As an initial matter, Dodd filed a motion challenging Assistant Attorney General Held's handling of his discovery requests.  In particular, Dodd complains about the timing of defense counsel's discovery responses, contending that he cannot follow the directive to attempt to resolve such disputes before bringing them to the court because AAG Held consistently ignores his follow-up inquiries.  In particular, Dodd complains that Held's delays made it difficult to file a timely opposition to defendants' motion for summary judgment.[10]  Construing this motion as a request for sanctions, it will be denied.

---

[10] Unrelatedly, Dodd asks that the court order defendant Veyna to sit for a polygraph test, which will be denied without further discussion, since polygraph evidence is not admissible.  For the same reason, it neither would nor could inform the court's resolution of defendants' motion for summary judgment.

While defendants acknowledge a delay in responding to Dodd's discovery request served March 25, 2020, their counsel credibly explained this failure was due to the Wisconsin DOJ's civil litigation unit being quarantined, resulting in a temporary communication problem.   More specifically, in this case, counsel represents that the discovery response was *emailed* to CCI's litigation coordinator timely, but not actually forwarded timely to Dodd.   Counsel further represents that when DOJ staff realized the mistake on April 30, 2020, Dodd was provided with responses to all outstanding discovery that same day.   Finally, notwithstanding Dodd's representation otherwise, AAG Held further attests that Dodd had *not* reached out to confer about this discovery dispute before filing the present motion.[11]

In reply, Dodd argues at length that the court should not credit any of Held's representations about the discovery dispute.   While it is apparent that Dodd and Held have been unable to work amicably with one another, Dodd has not submitted evidence refuting Held's general representations.   Critically, Dodd has identified *no* letters or communications asking defense counsel to meet and confer in an effort to resolve their discovery disputes informally.   Moreover, having reviewed the parties' submissions and Dodd's evidence, the court finds no reason to doubt Held's representations regarding their responses to Dodd's numerous discovery requests, other than the unfortunate "he said/she said" dueling affidavits that the court and (no doubt) parties find so tedious.   Regardless, Dodd has not actually identified how his summary judgment opposition would have been

---

[11] Indeed, Held represents that Dodd's last communication were two letters received on March 23, 2020, before the disputed discovery was even served.

different had he possessed the April 30 discovery responses sooner.  Seeing no sanctionable behavior or prejudice, therefore, Dodd's motion will be denied.

## II.    Summary Judgment

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If the moving party meets this burden, the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–407 (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted). During summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party; however, this treatment does not extend to inferences supported by only speculation or conjecture.  *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019). Here, defendants seek judgment in their favor on the grounds that:  (1) Dodd failed to exhaust his administrative remedies with respect to his claims in this lawsuit; and (2) the undisputed evidence does not support his claims.  The court will address these grounds separately.

### A.    Exhaustion

In a prior opinion and order, the court denied defendants' motion for summary judgment on exhaustion grounds.  (Dkt. #52, at 7-8.)   Specifically, given Dodd's

15

undisputed averments that he did not receive the decision on his inmate complaint until April 12, then immediately submitted an appeal, as well as the fact that "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of,'" *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016) (quoting *Booth v. Churner*, 532 U.S. 731 (2001)), the court held that defendants had not met their burden to prove Dodd's failure to exhaust.  In particular, the court was not persuaded that ICE's averments about Columbia's mail procedures, at least when coupled with defendants' argument that it was *likely* Dodd mailed his appeal many days after dating it, left a genuine issue of material fact about when Dodd actually received the ICE decision and submitted his appeal for mailing.  At the same time, the court acknowledged that defendants *may* be able to submit such evidence and allowed them to come forward with additional evidence related to this defense.  Rather than submit additional evidence, however, defendants instead seek reconsideration or, in the alternative, an evidentiary hearing to resolve the factual disputes related to their affirmative defense pursuant to *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008).  Although reconsideration is not appropriate on this record, the court agrees (with some skepticism), that defendants are entitled to a *Pavey* hearing.

In seeking reconsideration, defendants argue that Dodd's appeal did not follow Wisconsin's procedures for presenting a good cause argument, citing *State ex rel. Laurich v. Litscher*, 2004 WI App 150, ¶¶ 22-24, 275 Wis. 2d 769, 686 N.W.2d 668, 674-75.  In *Laurich*, the court concluded that a prisoner had waived his right to make a good cause argument because he did not actually specify his grounds on appeal.  *Id.* Defendants

16

contend that Dodd's assertion that he believed he only had ten days from March 16, and his assertion that he had been in the Milwaukee County Jail from March 24 or 25 to April 5, were inadequate because Dodd did not explain why it had taken him until April 12 to submit the appeal *or* the April 25 postmark.  To start, Dodd obviously would not be able to explain the April 25 postmark at the time he was mailing his appeal, since he contends he mailed it April 12.  Furthermore, while Dodd appears to have misunderstood when his 10-day clock for appealing began, it is undisputed that Dodd acknowledged his appeal may be deemed late *and* presented an argument to justify his untimeliness after returning from the jail -- that he still had not received the RA's decision.  While this explanation was based on a misunderstanding of the applicable regulations, it is *not* a waiver of the good cause exception.

Defendants also contend that the "good cause" question must be decided under Wisconsin state law, which does not recognize an equitable exception to exhaustion.  Yet the court made no finding that the CCE's good cause ruling was erroneous; instead, the court recognized Dodd's assertion he was *prevented* from submitting a timely appeal when he submitted it for mailing on April 12 (an issue he could not have raised in his appeal because it occurred after he submitted his appeal), permitting a finding that Dodd exhausted all administrative remedies available to him at the time.  Accordingly, the court declines to reconsider its decision on the ground that Dodd's explanation in his appeal did not follow the applicable procedures.[12]

---

[12] Because Dodd was permitted to appeal if he did not receive a decision from the Reviewing Authority within 30 working days of ICE acknowledging receipt of his inmate complaint, Wis. Admin. Code § 310.12(3) (2014), defendants further argue that Dodd failed to exhaust even *before*

As for defendants' alternative request for a *Pavey* hearing, they apparently do not intend to submit more evidence, nor wish to argue that the reasoning in *Locket v. Bonson*, 937 F.3d 1016 (7th Cir. 2019), supports their non-exhaustion defense.   Instead, defendants again take issue with Dodd's averments about when he submitted his appeal for mailing.  Just as the court did, defendants fairly point out that Dodd's assertions about segregation staff interfering with his mail were vague, but it is unclear what else Dodd could submit to prove that he mailed his appeal on April 12 beyond his own assertion and the date on his appeal form.  Simply put, Dodd was not in a position to know any more.

Furthermore, defendants do not explain how Glass's general averments about Columbia's mail collection system addresses the concerns Dodd raised about possible interference.   In particular, Glass does not attest that in or around April of 2016, correctional officers did not withhold mail; Glass merely provided the regular practice in general population and segregation.  To be fair, however, it would be extremely difficult for defendants to come forward with such specific evidence to rebut Dodd's vague representations.  While the court is skeptical that defendants can discredit Dodd's version of the facts through cross-examination based largely on a hunch that Dodd lied and only minimally on Glass's assertions, the court will conduct a *Pavey* hearing to resolve the question of exactly when Dodd placed his appeal outside of his cell for mailing.  *See Wagoner v. Lemmon*, 778 F.3d 586, 590 (7th Cir. 2015).

---

he went to the Milwaukee County Jail.  According to defendants, since Dodd *could* appeal his inmate complaint starting March 18, 2016, when Dodd was still located at CCI, he should have and has not explained his failure to do so.  However, defendants do not suggest that the Wisconsin procedures *required* Dodd to file an appeal at that time.  Therefore, this is not an independent basis to conclude that Dodd failed to exhaust his administrative remedies.

B.     Merits

Defendants also seek judgment on the merits of Dodd's deliberate indifference claims.  The Eighth Amendment gives prisoners the right to receive adequate medical care. *Estelle v. Gamble*, 429 U.S. 97 (1976).  To prevail on a claim of constitutionally inadequate medical care, however, an inmate must demonstrate two elements:  (1) an objectively serious medical condition; and (2) a state official who was deliberately (that is, subjectively) indifferent.  *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011).  For purposes of summary judgment, defendants concede that Dodd's hand injury constituted a serious medical need, focusing instead on the deliberate indifference element.

"Deliberate indifference" means that the official was aware that the prisoner faced a substantial risk of serious harm but disregarded that risk by consciously failing to take reasonable measures to address it.  *Forbes v. Edgar*, 112 F.3d 262, 266 (7th Cir. 1997). Deliberate indifference constitutes *more than negligent* acts or even grossly negligent acts, although it requires something less than *purposeful* acts.  *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).  Accordingly, the threshold for deliberate indifference is met where:  (1) "the official knows of and disregards an excessive risk to inmate health or safety"; *or* (2) "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," *and* he or she draws that inference yet deliberately fails to take reasonable steps to avoid it.  *Id*. at 837; *see also Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) ("evidence of malpractice is not enough for a plaintiff to survive summary

19

judgment on an Eighth Amendment claim, nor is a doctor's claim he did not know any better sufficient to immunize him from liability in every circumstance").

A jury may "infer deliberate indifference on the basis of a physician's treatment decision [when] th[at] decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("A prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'") (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)).  In *Petties,* the Seventh Circuit outlined categories of conduct that could support a finding of deliberate indifference in a medical setting:  (1) when a doctor refuses to take instruction from a specialist; (2) when a doctor fails to follow an accepted protocol; (3) when a medical provider persists in a course of treatment known to be ineffective; (4) when a doctor chooses an "easier and less efficacious treatment" without exercising professional judgment; or (5) when the treatment involved an inexplicable delay lacking a penological interest.  *Petties*, 836 F.3d at 729-31.  The court is to look at the "totality of [the prisoner's] medical care when considering whether that care evidences deliberate indifference to serious medical needs."  *Id.* at 728; *Wilson v. Adams*, 901 F.3d 816, 821 (7th Cir. 2018).

For reasons explained below, while Nurse Veyna is entitled to judgment as a matter of law, Dr. Syed is not as to both the merits of the claim against him and his assertion of qualified immunity.

1. **Nurse Veyna**

There are just three instances in the record indicating that defendant Veyna was involved in Dodd's care:  (1) Dodd claims Veyna interacted with him shortly after he initially broke his hand on November 13, 2015; (2) Veyna provided Dodd an ice bag on April 20, 2016; and (3) Veyna placed Dr. Syed's order for Dodd's surgery on May 6.

Starting with the November 13 encounter, and even accepting an inference that it was Veyna who Dodd spoke to that day, her actions do not support an inference of deliberate indifference.  To the contrary, Veyna provided him with Naproxen and a bandage, and according to Dodd, informed him his hand was fractured.  Dodd believes that Veyna's claimed surprise that no one had told him his hand was broken suggests deliberate indifference, but his own assertions acknowledge that she provided him medical attention and did not refuse him treatment.  Thus, there is no basis to conclude that Veyna consciously disregarded Dodd's need for medical attention on November 13, 2015.

Defendant Veyna's April 20, 2016, interaction with Dodd is even more limited:  she brought him an ice bag in restrictive housing as ordered.  Dodd has not pointed to any evidence of record refuting this action nor that Veyna needed to do more to treat Dodd's injury adequately at that time.  As such, it would similarly be unreasonable to infer that Veyna's handling of Dodd's need for medical care on April 20 exhibited deliberate indifference to his broken hand.

Finally, Dodd would hold Veyna accountable for the fact that no one acted on Dr. Syed's original March 18 order for surgery and a cock-up splint, which Dr. Syed reordered on May 6.  To begin, Dr. Syed's original order for surgery appears, at best, to have fallen

through the cracks, causing an approximate delay of a month and a half in Dodd's corrective surgery.  More problematic still is defendants' failure to even attempt to explain why Dr. Syed had to place a second order for surgery on May 6, 2016, before it was allowed to proceed.  Yet, critical to Dodd's claim against defendant Veyna, he has not submitted evidence that Dr. Syed's March 18 order was communicated to anyone in the HSU, much less to Veyna directly.  Although apparent that no one followed up on Syed's March order, the record does not reveal who dropped the ball, and Dodd has cited to no evidence of record that would permit a reasonable fact-finder to conclude that Veyna knew about the March 18 order and ignored it.  Accordingly, there is no basis for a reasonable jury to find Veyna *personally* liable for the month-and-a-half delay between when the surgery was first ordered and when the second order was processed.  *Matz v. Klotka*, 769 F.3d 517, 528 (7th Cir. 2014) ("A damages suit under § 1983 requires that a defendant be personally involved in the alleged constitutional deprivation.").

Dodd's argument to the contrary is a non-starter.  Specifically, Dodd can only point to Dr. Syed's May 6, 2016 order (*see* Ex. 1000 at 32), and Veyna's representation that she placed the order with UW Orthopedics that day.  However, this evidence does not permit an inference that Veyna knew about Dr. Syed's March 18 order and failed to fax it to UW Orthopedics at that time.  If anything, it shows that Veyna knew about Dr. Syed's *second* order and acted promptly to place it the same day Dr. Syed wrote it.  Since no evidence of record indicates Veyna knew about Dr. Syed's March 18 order, no reasonable fact-finder could conclude that her claimed failure to act on it exhibited deliberate indifference. Accordingly, Veyna is entitled to summary judgment in her favor.

22

### 2.   Dr. Syed

For essentially similar reasons, defendants argue that the totality of Dr. Syed's care for Dodd's hand issue does not support a reasonable inference of deliberate indifference, pointing out the various orders, medications and accommodations Dodd received between November 2015 and June of 2016 while under Dr. Syed's care, including a splint, ice, a partial cast, pain medication, an x-ray and follow-up x-ray, physical therapy, a CT scan, referral to an orthopedic specialist and surgery.  Again, defendants are correct that the court must look at the totality of this care, but as Dodd correctly points out, there are three substantial, unexplained, gaps in his care permitting a reasonable jury to infer that Syed either failed to exercise medical judgment or persisted in a course of treatment he knew to be ineffective.

*First*, Dodd points to Dr. Syed's December 18, 2015, decision to discontinue his use of the hand splint, apparently while *still* not physically examining Dodd.  This decision is problematic for two reasons.  To start, there appears no dispute that while the original November 10 x-ray report showed healing of an earlier break of Dodd's fourth metacarpal bone had healed and "normal" articulations on the second through fifth carpometacarpal, it also identified a *new* fracture at base of the right *fifth* metacarpal *and* possibly related dislocation of carpal-metacarpal joint that may require surgery.  Dr. Syed does not explain whether he saw this new break or possible dislocation, nor Dr. Rivera-Morales's failure to address either in his review of Dodd's December 10 follow-up x-rays before deciding to cancel Dodd's splint order.  Moreover, a reasonable jury might infer Dr. Sayed's complete failure to even inquire about the status of the break and possible dislocation at the fifth

metacarpal after being specifically noted on the November 10 x-ray suggests not just a mistake, but a failure to exercise medical judgment, especially considering Dodd's ongoing requests to be seen by a physician.

To be fair, if Dr. Syed had averred that he bothered to review Dodd's x-ray reports after receiving them and had some reason to believe that Dodd's fifth metacarpal had healed, the result might be different.  As the record currently stands, however, there is *no* evidence that Dr. Syed exercised any independent judgment with respect to Dodd's broken hand, which supports an inference of deliberate indifference in discontinuing his hand split on December 18.  *See Mitchell v. Kallas*, 895 F.3d 492, 501 (7th Cir. 2018) (concluding that an absence of evidence that a doctor exercised medical judgment precluded a finding of summary judgment in a doctor's favor); *see also Sain v. Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (medical professionals are entitled to deference when it comes to treatment decisions "unless ' no minimally competent professional would have so responded under those circumstances'" (quoting *Collignon v. Milwaukee Cty.*, 163 F.3d 982, 988 (7th Cir. 1998)).

Even assuming that defendant Syed's complete failure to account for Dodd's fifth metacarpal break and possible dislocation amounted to just negligence or gross negligence, Dr. Syed *also* failed to even examine Dodd in person.  This failure further compounds how problematic his original failure became with each, additional effort by Dodd to see any doctor and then a specialist as his apparently unnecessary pain went unabated for months, and arguably graduates his handling of the x-rays from negligence or gross negligence to a constitutional violation.  Indeed, to validate his decision that Dodd's hand no longer

24

required a splint -- or *any* other type of support as a substitute -- it would have seemed necessary to *at least* examine Dodd's hand, or, at the very least, schedule Dodd for a follow up appointment to palpate his hand after taking away his splint. However, the record does not even suggest that Dr. Syed attempted to schedule Dodd for any kind of follow up. And, again, Dr. Syed provides no explanation as to why, in his professional opinion, it was unnecessary to examine Dodd's hand before discontinuing his splint in light of his ongoing complaints of pain and requests to be seen. Accordingly, a reasonable fact-finder might well conclude that Dr. Syed's decision-making process on December 18, 2015, exhibited deliberate indifference.

*Second,* Dodd points to defendant Syed's handling of the results of his January 26, 2016, CT scan. Despite that CT scan *confirming* Dodd's "chronic displaced impaction fracture" on the entire base of the fifth metacarpal, the record merely reflects that Dr. Syed "followed up" with Dr. O'Brien. Not only does the record not reveal the substance of that conversation, but the record suggests that Dr. Syed still refused to consider or even address Dodd's ongoing reports of pain, much less meet with Dodd to assess his hand and address his concerns. On the contrary, Syed did not actually examine Dodd until March 18, 2016.

Moreover, while the record indicates Dr. Syed had "approved" Dr. O'Brien's mid-January 2016 order for the cock-up splint, the record does not reflect that he took *any* steps to ensure that order was placed. As importantly, Syed does not appear to have assured that Dodd's hand was mobilized or protected in any way *in the meantime*. The fact that Dr. Syed terminated Dodd's splint on December 18, then was advised (for the second time) that his right finger was still fractured at its base, but still took *no* corrective action to

25

immobilize his hand or address his pain supports a reasonable inference that he failed to exercise any medical judgment. *See Dobbey v. Mitchell-Lawshea*, 806 F.3d 938, 940 (7th Cir. 2015) ("The decision of a medical professional to do nothing, even though she knows that a patient has a serious medical condition requiring prompt treatment that the professional is capable of and responsible for providing, amounts to deliberate indifference.").

Adding insult to plain injury, Dr. Syed does not even explain why he finally placed the order for the cock-up splint on March 18, along with the first order for surgery, so long after reviewing the results of Dodd's January 26 CT scan. Indeed, viewing this record in Dodd's favor, it is certainly reasonable to infer that the *only* reason that Dr. Syed met with him in March was in response to *Dodd's* March 9, 2016, HSR asking for the results of the CT scan. Yet Dr. Syed does not even acknowledge this long delay, much less provide a *medical* reason for leaving unaddressed the January 26 CT affirming Dodd's broken finger. Based on this record, therefore, a reasonable fact-finder might well conclude that his delay lacked any medical basis and unnecessarily prolonged Dodd's pain. *See Goodloe v. Sood*, 947 F.3d 1026, 1032 (7th Cir. 2020) (a delay in treatment that went unexplained may support a finding that the delay lacked any medical justification).

*Third*, defendant Syed's handling of Dodd's pain management as a whole supports a reasonable inference that he either persisted in an ineffective course of treatment or failed to exercise medical judgment. Before his eventual surgery, it appears Dr. Syed increased Dodd's Naproxen dosage from 220 mg to 440 mg after confirmation that Dodd broke his hand,[13] and then apparently at some point in early 2016, increased the Naproxen up to

---

[13]  It appears that Dodd's low bunk restriction continued throughout the relevant time, or at least

500 mg daily.  However, at no point does it appear that Dr. Syed actually evaluated whether to alter Dodd's medications at the end of January, when he at best learned about Dodd's chronic fracture had previously been missed.  Worse, even when Dr. Syed finally met with Dodd on or around March 18, and apparently made a note to consider a light dose of narcotics, there is *no* indication from the record that Dr. Syed actually followed up to change his prescription, or even considered that option, much less deemed it medically unnecessary.  Even so, absent from Dr. Syed's declaration are any statements explaining his decision-making process related to Dodd's pain management during this six-month time frame, which precludes a finding that he actually exercised medical judgment.  On one hand, Dr. Syed's apparent failure to follow-up about the possibility of a light narcotic may have been a gross omission or mistake; on the other hand, and drawing every inference in Dodd's favor, a reasonable fact-finder may conclude that Dr. Syed knowingly persisted in wholly ineffective pain management even after learning that Dodd's hand was still broken.

Defendant Syed's handling of Dodd's pain management after surgery likewise supports a finding of deliberate indifference.  In particular, Dodd claims that Dr. Syed refused to allow him to take the Tylenol 3 as recommended by Dr. Tueting.  Dr. Syed's position appears to be that he deemed Dr. Tueting's Tylenol 3 prescription unnecessary because Dodd had already been given access to Tylenol 3 for the month of June, but Dodd's surgery was on June *29*, 2016, a fact that would have been obvious to Dr. Syed at that time had he bothered to look.  Thus, it would be reasonable to infer that Dr. Syed's refusal

---

that Dr. Syed did not terminate the restriction.

27

to approve Dr. Tueting's recommendation for adequate post-surgery pain medication is further evidence of his deliberate indifference to Dodd's pain.  Indeed, it is undisputed that Dodd repeatedly complained about his pain to HSU staff, but Dr. Syed never adjusted his medication, much less examined him, after his surgery.  Once again, Dr. Syed fails to offer any explanation for believing that Dodd's pain management after surgery was appropriate. This complete failure to explain himself may also support an inference of deliberate indifference, at least in the face of Dodd's repeated complaints that he was in pain and the medications he was taking were not working.

Accordingly, while the court accepts that defendant Syed made certain appropriate choices in handling Dodd's broken hand between November 2015 and June 2016, a reasonable fact-finder may nevertheless conclude that the totality of his handling of Dodd's broken hand exhibited deliberate indifference.  This leaves only Dr. Syed's dubious claim to qualified immunity on this record.

"Qualified immunity protects government officials from damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (quoting *Estate of Clark v. Walker*, 865 F.3d 544, 549-50 (7th Cir. 2017)). The required inquiry by this court is two-fold:  "(1) whether the facts, taken in the light most favorable to the plaintiff[], show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation."  *Gonzales v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009).  Since it was clearly established in 2015 and 2016 that Dodd was entitled to medical care for his broken finger,

and a reasonable fact-finder might conclude on this record that Dr. Syed failed to exercise any medical judgment in the handling of Dodd's need for treatment and pain management, the court will deny defendants' motion for summary judgment to Dr. Syed on this ground as well.

ORDER

IT IS ORDERED that:

1. Plaintiff Jason Dodd's motion for sanctions (dkt. #84) is DENIED.

2. Defendants' motion for summary judgment (dkt. #56) is GRANTED as to defendant Veyna and DENIED as to defendant Dr. Syed.

3. At the close of this case, the clerk of court is directed to enter judgment in defendant Veyna's favor.

4. Defendants' motion to modify the trial schedule (dkt. #93) is GRANTED, and the parties may have until August 28, 2020, to file their pretrial submissions. Responses to those submission will be due on or before September 11, 2020.

5. The September 18, 2020, telephonic final pretrial conference is converted to a videoconference.  Before discussing trial-related issues, the court will hold a *Pavey* hearing to resolve defendant Dr. Syed's exhaustion affirmative defense.

Entered this 17th day of August, 2020.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

29